**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**PENNY ROCK,**

                                            **Plaintiff,**

        **vs.**                                                        **8:14-cv-01421**
                                                                       **(MAD/CFH)**

**MICHAEL BLAINE, THOMAS**
**LAVALLEY, DANIEL HOLDRIDGE,**
**THE STATE OF NEW YORK, NEW**
**YORK STATE DEPARTMENT OF**
**CORRECTIONS AND COMMUNITY**
**SUPERVISION,**

                                            **Defendants.**
_____

**APPEARANCES:**                                    **OF COUNSEL:**

**LAW OFFICES OF ELMER ROBERT**             **ELMER R. KEACH, III, ESQ.**
**KEACH, III, P.C.**                              **MARIA K. DYSON, ESQ.**
One Pine West Plaza - Suite 109
Albany, New York 12205
Attorneys for Plaintiff

**BREEDLOVE, NOLL LAW**                      **BRIAN BREEDLOVE, ESQ.**
**FIRM - QUEENSBURY OFFICE**                 **CARRIE MCLOUGHLIN NOLL, ESQ.**
82 Glenwood Avenue
Queensbury, New York 12804
Attorneys for Defendant Michael Blaine

**OFFICE OF THE NEW YORK**                   **MICHAEL G. MCCARTIN, AAG**
**STATE ATTORNEY GENERAL**
The Capitol
Albany, New York 12224
Attorney for Defendants Thomas
LaValley, Daniel Holdridge, The State of
New York, New York State Department
of Corrections and Community
Supervision

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

# I. INTRODUCTION

On December 31, 2014, Plaintiff Penny Rock ("Plaintiff") filed an amended complaint against Defendants the State of New York, the New York State Department of Corrections and Community Supervision ("DOCCS"), Michael Blaine ("Defendant Blaine"), Thomas L. LaValley ("Superintendent LaValley"), and Daniel Holdridge ("Captain Holdridge") (collectively "Defendants") pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-5 et seq., 42 U.S.C. § 1983, and the New York State Human Rights Law ("NYSHRL") § 297 alleging gender discrimination, retaliatory conduct, and violation's of Plaintiff's First and Fourteenth Amendment rights. *See* Dkt. No. 6.

Currently before the Court are Defendants LaValley, Holdridge, DOCCS, and the State of New York's (collectively "State Defendants") motion for summary judgment (Dkt. No. 91) and Defendant Blaine's motion for summary judgment (Dkt. No. 92). For the following reasons, Defendant Blaine's motion is denied and State Defendant's motion is granted in part and denied in part.

# II. BACKGROUND

## A.    Clinton Correctional Facility

Clinton Correctional Facility ("Clinton CF") is one of the many state penal facilities operated by DOCCS. *See* Dkt. No. 106 at 1. Clinton CF employs approximately 1300 people in order to supervise its approximately 2800 inmates. *See id.* at 15. Over the time relevant to events of this case, Superintendent LaValley was the superintendent of Clinton CF and charged with taking care of its inmates and employees. *See id.* at 14-15.

Correctional officers at Clinton CF receive their specific posts through a bidding process. *See* Dkt. No. 105-5 at 23:7-8. When a position becomes available, an officer can fill out a form

and request to be placed in that job. *See id.* at 23:9-20. The position is awarded to the most senior officer to bid for it. *See id.*

Once an officer receives a bid post, they are contractually entitled to work at that post and prison management is not able to simply remove them from that position. *See* Dkt. No. 105-2 at 109:9-12. According to Superintendent LaValley, even he would not have authority to remove an officer that posed a serious threat to other officers from his bid job post. *See* Dkt. No. 105-9 at 80:8-20. However, when there is good cause, the Bureau of Labor Relations can place an officer on administrative leave without running afoul of the collective bargaining agreement. *See* Dkt. No. 105-2 at 24:9-18.

Similarly, a supervising officer does not have the discretion to terminate a subordinate. *See* Dkt. No. 102-25 at 2-4. Instead, a supervisor must write their superior to request disciplinary action, who then makes a request to their superior, and so on, until the complaint reaches DOCCS' Bureau of Labor Relations, which eventually makes a determination on the matter. *See id.*; Dkt. No. 103-2 at 2; Dkt. No. 91-7 at ¶¶ 38-39.

Plaintiff has been employed as a correctional officer ("CO") by DOCCS for over twenty years. *See* Dkt. No. 105-5 at 10:16-23. In 2013, Plaintiff's shift was from 2:00 p.m. to 10:00 p.m. *See id.* at 24:14-16. Plaintiff's bid job duties involved supervising both the mess hall and the prison barbershop. *See* Dkt. No. 104-25 at 87:20-88:3. When her dispute with Defendant Blaine began, Plaintiff had worked in the barbershop for approximately four years. *See* Dkt. No. 91-28 at 5.

Captain Holdridge was a Captain at Clinton CF during the period relevant to this case. Captain Holdridge was Defendant Blaine's immediate supervisor. *See* Dkt. No. 102-25 at 2.

Defendant Blaine, a lieutenant, worked as the afternoon watch commander in the prison. *See* Dkt. No. 106 at 16. As afternoon watch commander, Defendant Blaine had jurisdiction over the prison's barbershop. *See id.* at 20. According to Superintendent LaValley, "[a]ny supervisor can make a round anyplace in the correctional facility as long as it's within their jurisdiction." Dkt. No. 105-9 at 44:22-45:1. Captain Holdridge described him as a person who "prides himself on controlling people. He is intelligent and knows exactly how far he can push." *See* Dkt. No. 103-22 at 4. *Id.* Outside of Clinton CF, Defendant Blaine was a "[h]ypnotist by trade." *Id.*

**B.    Laware Conflict and Resolution**

On February 28, 2013, Plaintiff had a verbal dispute with CO Joshua Laware ("CO Laware") over his conduct in the prison dining hall and his treatment of prison employees. *See* Dkt. No. 102-8 at 2-3. This dispute led Plaintiff to present a written complaint to Captain Holdridge. *See id.*

Captain Holdridge responded to this complaint by holding a meeting with Plaintiff and Laware to resolve the issue. *See* Dkt. No. 106 at 2. The meeting effectively resolved the dispute between Plaintiff and CO Laware with CO Laware recognizing that his behavior had crossed the line. *See* Dkt. No. 103-22 at 2. Captain Holdridge asked Defendant Blaine to address the pair during the conflict resolution in his capacity as the watch commander. *See* Dkt. No. 91-8 at 1. Defendant Blane "refused to participate in any conversation and stated in front of the Officers 'This is inappropriate.'" *See id.*

**C.    Defendant Blaine's Response to Laware Meeting**

Both Plaintiff and Captain Holdridge were concerned that Defendant Blaine would retaliate against Plaintiff. *See* Dkt. No. 104-25 at 8:1-14. Captain Holdridge attempted to stop Defendant Blaine from retaliating against Plaintiff by meeting with him immediately after he

4

finished with Plaintiff and Laware. *See id*. at 9:10-11. However, Captain Holdridge could not dissuade Defendant Blaine from retaliation. Over the following year, Defendant Blaine would repeatedly harass Plaintiff inside and outside the prison.

In early April 2013, Defendant Blaine verbally counseled Plaintiff her for standing around the gate at the end of her shift. *See* Dkt. No. 103-3 at 2. On April 4, 2013, Plaintiff was at the gate with approximately six other officers when she was asked by a sergeant to provide a written explanation for why she was at the gate and not at the barbershop as per Defendant Blaine's instructions. *See id.* Captain Holdridge believed Plaintiff was the only officer at the gate to receive a reprimand. *See id.*

On June 12, 2013, Defendant Blaine emailed Captain Holdridge, Deputy Superintendent of Security Steven Brown ("DSS Brown"), and Superintendent LaValley requesting to change Plaintiff's bid job duties. Dkt. No. 102-14 at 2. He requested that the end of Plaintiff's shift include supervising building six after the program at the prison barbershop finished. Dkt. No. 104-25 at 84:16-85:12. Captain Holdridge denied the request, noting that such a change was inefficient given that there was only thirty minutes left on Plaintiff's shift and there were multiple available officers who had ninety minutes left on their shifts. *See id.* at 85:6-86:12. DSS Brown agreed with Captain Holdridge and wrote to Defendant Blaine that "[i]t is very obvious that you are not attempting to utilize staff correctly. It is very apparent that you are targeting CO Rock." Dkt. No. 102-17 at 2.

On July 22, 2013, Plaintiff filed a gender discrimination complaint against Defendant Blaine (the "July Complaint") with the United States Equal Employment Opportunity Commission (the "EEOC"). *See* Dkt. No. 106 at 4. Plaintiff's complaint led the Office of Diversity Management (the "ODM") to investigate Defendant Blaine's conduct. *See* Dkt. No.

103-14.  In September 2013, the investigation concluded that there was insufficient evidence to support a claim of discrimination against Defendant Blaine.  *See id.* at 6.

**D.    The Second Complaint**

On December 19, 2013, the ODM received a second complaint from Plaintiff alleging that Defendant Blaine had been harassing her since February 2013 prompting the ODM to launch a second investigation.  *See* Dkt. No. 103-10 at 4; Dkt. No. 91-28 at 2.  On January 13, 2014, Jason Parish ("Investigator Parish"), an ODM investigator, contacted Plaintiff regarding her complaint against Defendant Blaine.  *See* Dkt. No. 91-28 at 1, 3.  Investigator Parish told Plaintiff that he was investigating all claims not contained in her previous complaint.  *See id.* at 12.

Investigator Parrish obtained written statements and conducted interviews with current and former employees at Clinton CF.  *See* Dkt. No. 91-28 at 9-10.  "A recurrent theme that kept arising was that the individuals being interviewed . . . were concerned about retaliation either against themselves or others" from Defendant Blaine.  Dkt. No. 91-28 at 19.  One CO stated "she was terrified of being labeled a rat" for participating in the investigation.  *Id.* (quotation omitted).  Another CO expressed her fear of retaliation and stated that she felt Defendant Blaine was "dangerous," vindictive," and "a maniac."  *Id.*  During the investigation, Captain Holdridge told Investigator Parrish that Defendant Blaine "continually states within earshot for my benefit that he is Teflon and bulletproof."  *See* Dkt. No. 103-22 at 4.

**E.    Retaliation After Plaintiff's July EEOC Complaint**

*1. Kilduff Complaint*

On July 26, shortly after Plaintiff filed the July Complaint, Liam Kilduff, a civilian cook at Clinton CF, filed a written complaint against Plaintiff alleging that Plaintiff had belittled him in front of inmates and staff.  *See* Dkt. No. 102-19 at 2.  In the course of investigating the complaint,

6

Captain Holdridge met with Plaintiff, who explained that she had a cordial two year working relationship with Kilduff and Plaintiff had given him food and flower pots. *See id.* Further over the course of their relationship, Kilduff had made "much more serious unprofessional statements" that she had never objected to because "[s]he considered them joking." *Id.* On August 1, 2013, Captain Holdridge interviewed Kilduff individually and together with Plaintiff. *See id.* at 2. Kilduff initially explained that he was advised to file a written complaint by his supervisor, although his subsequent written response made no mention of this. *See* Dkt. No. 91-28 at 19. Further, Kilduff mentioned that he encountered Defendant Blaine outside of work two days before he wrote the complaint, although Kilduff denied that Defendant Blaine directed him to file the complaint. *See id.* Defendant Blaine, when asked about the encounter, gave a blanket denial of ever encountering Kilduff outside of work. *See id.*

After discussing the conflict with Kilduff and Plaintiff, Captain Holdridge concluded that the actual claim was minimal and considered the matter resolved. *See* Dkt. No. 102-19 at 3. However, Captain Holdridge believed that there was "an influence that led to this complaint." *Id.*

### 2. Barbershop Harassment and Scrutiny

Plaintiff contends that after she filed the July Complaint, Defendant Blaine began conducting rounds in the barbershop more frequently during Plaintiff's shift. *See* Dkt. No. 102-4 at ¶ 11. According to Plaintiff, Defendant Blaine would inspect her post "late at night, oftentimes after all of the inmates were gone, and would stare, smirk, and lean in closely to [her] face while he signed [her] logbook. Prior to [her] filing [the July Complaint,] . . . [Defendant] Blaine rarely conducted rounds in her workspace," and he would rarely conduct those rounds when she was alone. *Id.* When Plaintiff was not alone, Defendant Blaine would refrain from engaging in this conduct. *See* Dkt. No. 104-14 at 4. Defendant Blaine's "smirk and stare" was, in the words of

7

Captain Holdridge, an "intimidation tactic he use[d] to harass, intimidate and provoke a response" in those who were a target of his ire. Dkt. No. 104-9 at 2; *see also* Dkt. No. 91-28 at 13 (Defendant Blaine's "[i]ntimidation would include . . . staring/leering and smirking at the target").

On January 19, 2014, Defendant Blaine ordered Plaintiff to "start writing the start and stop times in the Logbook for Barbershop activities." Dkt. No. 91-28 at 20. Defendant Blaine did not give CO Mason a similar order until March 3, 2014. *See id.* at 18. Defendant Blaine claimed that he did not notice CO Mason omitting this information until that point. *See id.* at 18. However, a subsequent review of the logbook showed that CO Mason had not been entering any start/stop times. *See id.* at 21. Captain Holdridge reported to Investigator Parrish that Plaintiff "does have a legitimate concern that 'she cannot make a mistake and must constantly look over her shoulder due to Lt. Blaine's intense scrutiny when he is on duty.'" *Id.* at 14. Investigator Parrish concluded that Plaintiff had "been subjected to heightened scrutiny and supervision by [Defendant] Blaine in order to retaliate against her for participating in covered actions." *Id.* at 21.

### 3. 2013 Performance Review

In late October Plaintiff received her annual performance evaluation, which Defendant Blaine had authorized on October 19, 2013. *See* Dkt. No. 102-20 at 3. Plaintiff's three previous evaluations received an overall score of "Excellent." *See* Dkt. No. 91-28 at 15-16. Her 2013 evaluation had an overall score of "Good," a level below "Excellent." *See id.* Further, Plaintiff received "Needs Improvement" regarding her relationship with fellow employees. *See id.* In her three previous evaluations, Plaintiff had only received a performance factor below "Excellent" once. *See id.* Plaintiff's direct supervisor said that he had to give Plaintiff the "Needs Improvement" rating because of her conflict with Laware or he would get in trouble. *See id.* Laware received a performance factor of "Outstanding" regarding his relationship with fellow

employees. *See id.* at 16. Plaintiff appealed the evaluation to Captain Holdridge, who formed a three-member board to address the appeal. On November 13, 2013, Captain Holdridge granted Plaintiff's appeal and upgraded the overall "Good" evaluation to "Excellent." However, her relationship with fellow employees remained at "Needs Improvement." Dkt. No. 102-21.

### 4. Outside of Work Harassment

Beginning on October 15, 2013, Plaintiff claims that Defendant Blaine began harassing her outside of work. *See* Dkt. No. 103-7 at 2. That day, Plaintiff encountered Defendant Blaine in a Kinney Drugs. *See id.* On Tuesday, October 29, 2013, Plaintiff again encountered Defendant Blaine at the Price Chopper in Plattsburgh. *See id.*; Dkt. No. 106 at 26. According to Plaintiff, Defendant Blaine pushed his cart in front of hers. *See* Dkt. No. 103-7 at 2. Plaintiff claims that after she said "hello there," Defendant Blaine responded "fuck you, you piece of shit." *Id.* Plaintiff also contends that Defendant Blaine announced "make way, wide load coming" and "wide load, make way." *Id.* After the incident, Plaintiff contacted Price Chopper to ask if there was a recording of the incident. *See id.* She was told that although Price Chopper had security cameras, the footage did not include audio. *See id.* Price Chopper notified her that only the police would have access to the footage. *See id.* at 3. Plaintiff then filed a police report. *See id.*

On October 31, 2013, Plaintiff sent a written complaint to Captain Holdridge. *See id.* at 2. In her complaint, Plaintiff stated that she has "a regular routine on Tuesdays and it seem[ed] like Defendant Blaine [was] following [her]." *See id.* On November 5, 2013, Captain Holdridge forwarded the letter to DSS Brown. *See* Dkt. No. 103-6 at 2.

On December 17, 2013, Plaintiff again encountered Defendant Blaine at Price Chopper. *See* Dkt. No. 103-12 at 2. Plaintiff was checking out next to a fellow CO from Clinton CF. *See id.* According to Plaintiff, her coworker "said Penny and motioned with his head." *Id.* When she

looked, she saw Defendant Blaine, who hurried into the men's bathroom upon being noticed. *See id.* On February 25, 2014, Plaintiff noticed Defendant Blaine's car parked two spots away from her car as she exited Price Chopper. *See* Dkt. No. 104-14 at 7. On May 22, 2014, while Plaintiff was driving into a local credit union, Defendant Blaine was driving out. *See* Dkt. No. 104-7 at 2. Defendant Blaine slowed down and stared and smirked at Plaintiff while he drove past her. *See id.*

### 5. Parking Lot & Lobby Harassment

On December 27, 2013, Director of ODM Deborah Nazon and Investigator Parrish requested that Superintendent LaValley serve a "cease and desist" memorandum on Defendant Blaine. *See* Dkt. No. 91-28. On December 30, 2013, Superintendent LaValley sent Defendant Blaine a letter notifying him that he had been the subject of "a complaint alleging harassment/retaliation." *See* Dkt. No. 103-15 at 2. The letter included a reminder that he was subject to DOCCS's personal conduct standards and non-discrimination policies. *See id.*

That day, Plaintiff contends that Defendant Blaine pulled into the parking lot ahead of her and stared at her for an extended period of time. Dkt. No. 104-14 at 4-5. The next day, Plaintiff attempted to avoid Defendant Blaine by parking in a different parking lot. *See id.* at 5. According to Plaintiff, Defendant Blaine waited for her in the lobby and stared and sneered at her as she approached. *See id.*

### 6. Missing Barbershop Equipment

Plaintiff took a two-week vacation in January 2014. *See* Dkt. No. 91-28 at 17. Soon after Plaintiff returned to work, she discovered that equipment from the barbershop was missing. *See id.* This was the first time equipment had gone missing in Plaintiff's time working at the barbershop. *See id.* at 5. A facility level investigation found no misconduct, but the equipment

was never recovered. *See id.* at 17.  Plaintiff contends that Defendant Blaine was somehow involved with missing supplies. *See id.* Captain Holdridge was also suspicious. *See id.* Given the timing of the occurrence and because Plaintiff had an exemplary record at maintaining her inventory, he believed that the missing equipment was "more than coincidental." *See* Dkt. No. 103-22 at 4.  When asked about Defendant Blaine's involvement during her deposition, Plaintiff admitted that she had no knowledge of who took the tools while she was away. *See* Dkt. No. 105-5 at 138:15-18.

### 7. *Tire Deflation*

At the end of Plaintiff's shift on February 12, 2014, Plaintiff discovered that someone had let the air out of three of her tires. *See* Dkt. No. 91-28 at 18.  Although the parking lot is monitored extensively with video cameras, the recordings are deleted after twenty-four hours. *See id.* While Plaintiff did not see who flattened her tires, she stated during her deposition that she believes Defendant Blaine was somehow involved because at the time, he was the only person with authority to allow an employee to leave the prison. *See* Dkt. No. 105-5 at 132:6-133:5.

### 8. *Inmate Grievance*

In February, Defendant Blaine accused a "specific employee" of coercing an inmate to file a grievance against him. *See* Dkt. No. 91-28 at 10, 17.  Defendant Blaine stated that this warranted "a closer investigation into the actions of the employee." *See id.* at 17.  Captain Holdridge asked Defendant Blaine about the "specific employee," and Defendant Blaine told him that the "'specific employee was C.O. Penny Rock." *See id.* However, upon investigation, Captain Holdridge determined that, although the inmate worked in the mess hall, the inmate did not work for Plaintiff or during her shift. *See id.* When Investigator Parrish asked Defendant Blaine what made him accuse Plaintiff of instigating the grievance, Defendant Blaine said "I did

not say her name" but then alluded to the fact that the inmate worked in the mess hall and this was his second grievance from an inmate working in the mess hall.  *Id.*

### 9. Impact of the Harassment

On November 4, 2013, Plaintiff left work to seek emergency medical treatment because of chest pains.  *See* Dkt. No. 102-4 at ¶ 8; Dkt. No. 102-3 at 2.  Plaintiff contends that the stress of Defendant Blaine's harassment caused the chest pains.  *See* Dkt. No. 102-4 at ¶ 8.  Plaintiff's physician instructed her to take two weeks of sick leave.  *See id.*  Plaintiff also took additional vacation in January 2014 to escape Defendant Blaine.  *See id.* at ¶ 9.  Plaintiff stated that it is her "practice to bank all . . . accrued vacation because the State of New York will pay [her] actual wages for the accrued time when [she] retire[s]."  *Id.*

Plaintiff further contends that, as a result of Defendant Blaine, she volunteered for significantly less overtime in 2013.  *See id.* at ¶ 5.  In 2011 and 2012 she worked 276.5 and 188.5 hours of overtime respectively.  *See* Dkt. No. 91-28 at 15.  In 2013 Plaintiff worked 156 hours of overtime.  *See id.*

## F.    Report Conclusion

On April 1, 2014, Investigator Parrish issued his Investigation Report.  *See* Dkt. No. 91-28 at 1.  He substantiated many of Plaintiff's specific claims of retaliation, but was unable to subsantiate claims of discrimination.  *See id.* at 19-21.  The report substantiated that Defendant Blaine orchestrated the Kilduff complaint, spoke profanely to Plaintiff at Price Chopper, subjected her to retaliatory scrutiny at the barbershop by closely inspecting her logbook and disparately ordering her to remain at her post, and targeted her in filing his complaint regarding the inmate grievance.  *See id.*  Investigator Parrish was unable to substantiate the remaining allegations.  *See id.*

**G.    Defendant Blaine's Retirement**

On August 15, 2013, Captain Holdridge sent a letter to DSS Brown requesting disciplinary action against Defendant Blaine for insubordination, conduct unbecoming a supervisor, and violating department attendance policy.  *See* Dkt. No. 102-25 at 2.  The letter also requested an investigation into his "use of state equipment, supplies and time to inappropriately post personal overtime worked, dollar amounts paid and promotions turned down . . . at Clinton Annex."  *Id.*  On August 19, 2013, DSS Brown wrote to Superintendent LaValley that "[u]pon review of Captain Holdridges [sic] attached report, . . . . I recommend [Defendant Blaine] be terminated from this department."  *See* Dkt. No. 103-2 at 2.  On March 7, 2014, DOCCS' Labor Relations Bureau approved a Notice of Discipline (the "NOD") against Defendant Blaine regarding Captain Holdridge's complaint.  *See* Dkt. No. 91-24 at 1.  As a result of the NOD, Defendant Blaine chose to retire on July 24, 2014.

On July 21, 2014, just three days before he retired, Defendant Blaine filed a complaint against Plaintiff and Captain Holdridge accusing Plaintiff of filing false discrimination and retaliation complaints against him.  *See* Dkt. No. 104-17 at 2.  The Office of Inspector General conducted a full inquiry into Plaintiff's conduct and ultimately concluded that Defendant Blaine's claims were unsubstantiated.  *See id.* at 14.

**H.    Procedural History**

On November 11, 2015, Plaintiff commenced this action against Defendants State of New York, Defendant Blaine, Superintendent LaValley, and Captain Holdrige.  *See* Dkt. No. 1.  In response to Defendants' motion to dismiss the original complaint, Plaintiff filed an amended complaint, adding DOCCS as a defendant.  *See* Dkt. No. 6.  The amended complaint alleged four causes of action:  First, that Defendants DOCCS and State of New York were liable for Defendant

13

Blaine's retaliatory conduct under Title VII. *See id.* at ¶ 32.  Second, that Defendant Blaine was liable under 42 U.S.C. § 1983 for violating Plaintiff's First Amendment rights under color of state law. *See id.* at ¶ 37.  Third, that Captain Holdridge and Superintendent LaValley were liable for failing to train and supervise Defendant Blaine resulting in the violation of Plaintiff's constitutional rights. *See id.* at ¶ 42.  Fourth, that Defendants State of New York, DOCCS, and Blaine were liable for discrimination, harassment, and retaliation under NYSHRL § 297.  *See id.* at ¶ 47.  The amended complaint included a demand for punitive damages against Defendant Blaine. *See id.* at ¶ 52.

On January 14, 2015, Defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) asserting that Defendant the State of New York was not a bona fide employer of any individual employed by Plaintiff.  *See* Dkt. No. 8-1 at 5.  On June 17, 2015, this Court denied the motion to dismiss.  *See* Dkt. No. 27.

The parties completed discovery on March 31, 2017.  *See* Dkt. No. 87.  On April 28, 2017, Defendants Holdridge, LaValley, DOCCS, and the State of New York (collectively "State Defendants") moved for summary judgment.  *See* Dkt. No. 91.  The same day, Defendant Blaine also moved for summary judgment.  *See* Dkt. No. 92.

### III. LEGAL STANDARD

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law.  *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted).  When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'"  *Id.* at 36-37 (quotation and other citation omitted).  Moreover, it is well settled that a party opposing a

motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[S]ummary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense." Fed. R. Civ. P. 56(a) advisory committee's note to 2010 amendment. Summary judgment may also be granted against any part of the remedy sought by the opposing party's claims. *See Hamblin v. British Airways PLC*, 717 F. Supp. 2d 303, 307 (E.D.N.Y. 2010).

## IV. DISCUSSION

**A.    Title VII and NYSHRL Retaliation Against Defendants DOCCS and the State of New York**

As an initial matter, the Court notes that the same standard is used when analyzing Title VII and NYSHRL claims. *See Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (citations omitted); *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003) (citation omitted). Section 704(a) of Title VII makes it unlawful for an employer to retaliate against an individual

"because he has opposed any practice made an unlawful employment practice by this subchapter . . . ." *Townsend v. Benjamin Enterprises, Inc.*, 679 F.3d 41, 48 (2d Cir. 2012). To plead a retaliation claim, a plaintiff must allege "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Littlejohn v. City of New York*, 795 F.3d 297, 316 (2d Cir. 2015) (quotation omitted).

### 1. Adverse Action[1]

Plaintiff contends that Defendant Blaine (1) engaged in intimidating conduct while supervising her in the barbershop and around the prison; (2) subjected her to heightened scrutiny and disparate rules; (3) attempted to sabotage Plaintiff's professional reputation by removing equipment from the barbershop, orchestrating a false harassment claim against her, and accused her of coercing a prisoner to file a complaint against him; (4) deflated her tires; and (5) stalked and berated her outside of work.

State Defendants argue that there is insufficient support within the record to constitute a triable question of fact for some claims and that the remaining retaliatory actions, even if true, are insufficient to support a Title VII and NYSHRL retaliation claim as a matter of law. The Court disagrees.

### i. Factual Disputes: Missing Equipment and Flat Tires

State Defendants argue that the record cannot support Plaintiff's allegations that Defendant Blaine removed equipment from the barbershop or deflated her tires. According to State

---

[1] This analysis also applies to the First Amendment and NYSHRL retaliation claims against Defendant Blaine.

Defendants, these allegations are not sufficiently supported by the record to create a triable question of fact.

First, as Captain Holdridge concluded, the circumstances surrounding the missing equipment were suspicious. The equipment shortage was discovered on January 25, 2014, shortly after Plaintiff returned from vacation. Additionally, Plaintiff had an exemplary record of maintaining her inventory. By that time, the animus that Defendant Blaine had against Plaintiff was more than a sufficient reason for him to act against her. He also had access to the area, given that the barbershop was within his jurisdiction as the watch commander. This combination of coincidence, suspicious circumstances, motives, and access are sufficient to create a triable question of fact as to whether Defendant Blaine was somehow involved with the missing equipment.

Similarly, there is a triable question of fact as to whether Defendant Blaine was involved in tampering with Plaintiff's tires. Even though Plaintiff cannot say for certain that Defendant Blaine was involved, Defendant Blaine was the only person in the prison at the time with the authority to allow employees out of the facility. This authority, combined with Defendant Blaine's hostility towards Plaintiff, and the fact that of all the cars in the lot to be targeted, the saboteur chose Plaintiff's, give rise to a triable question of fact that cannot be resolved at summary judgment.

### ii. Aggregation of Conduct

State Defendants next argue that even if Defendant Blaine committed all of these retaliatory acts, they do not rise to an adverse employment action. However, State Defendants' argument fails to consider the aggregate effect of Defendant Blaine's alleged conduct.

"Title VII's anti-discrimination and anti-retaliation provisions 'are not coterminous'; anti-retaliation protection is broader and 'extends beyond workplace-related or employment-related retaliatory acts and harm.'" *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)). In a Title VII retaliation claim, an adverse employment action is one that is "materially adverse to a reasonable employee or job applicant." *Id.* (quoting *White*, 548 U.S. at 57) (internal quotation marks omitted). "Actions are 'materially adverse' if they are 'harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *White*, 548 U.S. at 57). Although Title VII "does not set forth a general civility code for the American workplace," *id.* (quoting *White*, 548 U.S. at 68-69), "the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Id.* (quoting *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006)). A finder of fact looking at a series of incidents that "may seem minor when viewed in isolation . . . could find that they rise to the level of actionable harm" when viewed collectively. *Phillips v. Bowen*, 278 F.3d 103, 110 (2d Cir. 2002) (citation omitted).

In *Brissette v. Franklin Cty., Sheriff's Office*, 235 F. Supp. 2d 63, 66-67 (D. Mass. 2003), the court found that female correctional officers faced retaliation from their superiors after lodging formal discrimination complaints. These complaints led to "constant hyper-scrutiny of their work, trumped up and sometimes secret investigations, aggressive questioning deliberately designed to intimidate them, inordinate and inappropriate discipline and chronic lack of support in a dangerous and stressful environment." *Id.* at 93. One of the plaintiffs was accused "of using her uniform insignia to give her color of authority to improperly enter [her brother's estranged]

wife's home." *See id.* at 76.  Although she was cleared after an investigation, the incident added to her stress.  *Id.*  Additionally, during a workplace misconduct investigation, one of the defendants repeatedly drove past one of the plaintiffs' homes very slowly.  *See id.* at 77.  As a result of this retaliation, the plaintiffs "suffered significant medical symptoms." *Id.* at 93.  The court concluded that "[t]his course of behavior was intentionally designed to cow the plaintiffs, punish them for their legitimate complaints and deter others from" from lodging complaints.  *Id.*

Here, Defendants have failed to show that the aggregate effect of Defendant Blaine's combined conduct would not dissuade a reasonable employee from initiating a complaint.  First, Plaintiff faced increased scrutiny of her logbook and duty requirements.  Defendant Blaine applied a double standard to Plaintiff in terms of remaining at her post and how she recorded entries in her logbook.  Further, Defendant Blaine increased the frequency of his inspections of Plaintiff's workspace.  As Captain Holdridge noted, Plaintiff had to "constantly look over her shoulder due to [Defendant] Blaines intense scrutiny when he [was] on duty." Dkt. No. 104-22 at 2.  Second, Plaintiff faced investigations as a result of "trumped up charges" similar to the plaintiffs in *Brissette*, including the Kilduff complaint, the missing barbershop equipment, the prisoner grievance issue, and Defendant Blaine's July 2014 grievance.  These investigations took up Plaintiff's time and added to the stress that Plaintiff was already experiencing in dealing with Defendant Blaine.  Third, Defendant Blaine repeatedly attempted to intimidate her.  Not only did Defendant Blaine subject Plaintiff to stares and smirks, a strategy that many employees described as intimidating, he also engaged in stalking, intentional violations of her personal space, and possibly even the destruction of her personal property.

Defendants have tried to focus the Court's attention on the innocuousness of each individual allegation.  However, as benign as each act may seem in isolation, the aggregate effect

is clear.  The stress forced Plaintiff to take medical leave and use additional vacation time in order to avoid Defendant Blaine.  Additionally, the ODM investigation documented the general fear of retaliation that the employees at Clinton CF felt.  As Investigator Parrish noted, there was "a clear picture that staff members felt they were putting not just their reputations, but their careers on the line by cooperating with this investigation."  Dkt. No. 91-28 at 19.  Given all of this, the Court concludes that this conduct, if found true by a jury, would be sufficient to establish an adverse employment action for a retaliation claim under Title VII and NYSHRL.

### 2. DOCCS's Liability Under Title VII

Under Title VII, an employer's liability for harassment may depend on the status of the harasser.  *See Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013).  "If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions.  In cases in which the harasser is a 'supervisor,' however, different rules apply."  *Id.*  "If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable."  *Id.*  "But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided."  *Id.* (citations omitted).

Ordinarily, an employee will be treated as a supervisor "when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"  *Id.* at 431 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

Although the State Defendants argue, and Plaintiff agrees, that Defendant Blaine was not Plaintiff's supervisor under *Vance*, the Court disagrees.  The majority in *Vance* noted that

> in modern organizations that have abandoned a highly hierarchical management structure, it is common for employees to have overlapping responsibilities with respect to the assignment of work tasks.  Members of a team may each have the responsibility for taking the lead with respect to a particular aspect of the work and thus may have the responsibility to direct each other in that area of responsibility.

*Vance*, 570 U.S. at 446.  The Supreme Court was concerned that an overly broad definition of supervisor could turn all employees into supervisors unless organizations adopted archaic, inefficient, and rigid hierarchies.  *See id.*  However, the majority noted that its definition of supervisor was not so formalistic that it would allow an organization to avoid supervisory liability by attempting "to confine decisionmaking power to a small number of individuals."  *Id.* at 447.  Where an employer places decisionmaking power to individuals who "rely on other workers who actually interact with the affected employee[s,] . . . the employer may be held to have effectively delegated the power to take tangible employment actions to the employees on whose recommendations it relies."  *Id.*  Thus, "a manager who works closely with his or her subordinates and who has the power to recommend or otherwise substantially influence tangible employment actions, and who can thus indirectly effectuate them, also qualifies as a 'supervisor' under Title VII."  *Kramer v. Wasatch Cty. Sheriff's Office*, 743 F.3d 726, 738 (10th Cir. 2014) (citing *Vance*, 570 U.S. at 446-47).

There is no dispute that Defendant Blaine did not have the power to take the "tangible employment actions" against Plaintiff that the Supreme Court described in *Vance*.  However, no one at Clinton CF had that authority.  Captain Holdridge did not have the authority to discipline Defendant Blaine for insubordination and DSS Brown did not have the power to terminate him

without approval from the Bureau of Labor Relations.  Superintendent LaValley even acknowledged that he did not have the power to remove someone from their post without outside approval.  State Defendants' position would mean that among the 1300 workers employed at Clinton CF, there was not a single supervisor under Title VII.

The Northern District recently had the opportunity to address this issue in *Cole*.  There, the plaintiff, a sergeant at a New York State correctional facility, alleged that various individuals, including a captain and her immediate supervisor, had created a hostile work environment.  *See Cole*, 2017 WL 1194233 at *12.  The court held that the captain and the plaintiff's immediate supervisor were supervisors within the scope of *Vance*.  *See id.*

Defendant Blaine had authority over Plaintiff.  He was, at times, the highest ranking person in the facility and charged with making rounds about the prison to act as the eyes and ears of DOCCS.  He signed off on her annual evaluation and had the authority to give her orders with regards to how she carried out her duties.  Unlike the modern workforce imagined in *Vance*, this power was never reciprocal.  The Court sees no reason to depart from the conclusion in *Cole*.  Thus, Defendant Blaine was Plaintiff's supervisor.

"[R]etaliation at the hands of a supervisor empowered to take tangible employment actions will trigger an employer's vicarious liability . . . ."  *Bethea v. City of N.Y.*, No. 11 CV 2347, 2014 WL 2616897, *7 (E.D.N.Y. June 12, 2014) (citing *Vance*, 570 U.S. at 424).  "[I]f no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided."  *Vance*, 570 U.S. at 424.

Although State Defendants asserted the affirmative defense to supervisor misconduct in their answer, *see* Dkt. No. 29 at ¶ 17, it was not asserted in their motion for summary judgment. As such, the Court will not assess the merits of the defense in this motion. Therefore, Defendants' motions for summary judgment on Plaintiff's retaliation claim is denied. Moreover, even assuming Defendants are attempting to raise the affirmative defense, the Court finds that questions of fact exist as to whether DOCCS exercised reasonable care to prevent and correct the retaliatory harassment.

**B.    NYSHRL Discrimination Claim Against Defendants the State of New York, DOCCS, and Blaine**

Discrimination claims under NYSHRL are evaluated under the burden-shifting framework set forth for Title VII claims in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). It is the plaintiff's burden to establish a *prima facie* case of discrimination. *See Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001) (citation omitted); *Lewis v. Erie Cnty. Med. Ctr. Corp.*, 907 F. Supp. 2d 336, 346 (W.D.N.Y. 2012) (citation omitted).

"To establish a *prima facie* case of gender discrimination under Title VII and the NYSHRL, a plaintiff must demonstrate: (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) circumstances surrounding the employment action that give rise to an inference of discrimination." *Fahrenkrug v. Verizon Servs. Corp.*, 652 Fed. Appx. 54, 56 (2d Cir. 2016) (citing *Montana v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 106-07 (2d Cir. 1989)) (internal footnote omitted); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973); *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 316 (2004) (holding that the *McDonnell Douglas* framework applies to discriminatory discharge claims brought pursuant to the NYSHRL) (citations omitted). Once established, a rebuttable presumption of discrimination arises and the burden shifts to the

defendant to articulate a legitimate, non-discriminatory reason for the adverse action.  *See Byrnie*, 243 F.3d at 102; *Lewis*, 907 F. Supp. 2d at 346.

State Defendants have argued that the NYSHRL discrimination claim fails because there was no adverse employment action.  The Court agrees.

In the context of a discrimination claim, the adverse employment action requires a higher threshold than in retaliation claims, such that the plaintiff endures a "'materially adverse change' in the terms and conditions of employment." *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (citation omitted).  "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation."  *Id.*

The materially adverse action must relate to the terms and conditions of employment. *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010).

> "Reprimands and excessive scrutiny of an employee can contribute to a finding that an adverse employment action has taken place. However, courts in this circuit have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation."

*Imperato v. Otsego County Sheriff's Dept.*, No. 3:13-cv-1594, 2016 WL 1466545, *16 (N.D.N.Y. Apr. 14, 2016) (quoting *Uddin v. City of New York*, 427 F. Supp. 2d 414, 429 (S.D.N.Y. 2006)) (internal quotation omitted).  Thus, a complaint must allege more than just the existence of a reprimand to establish an adverse action, it must also allege facts that indicate a demonstrably adverse employment consequence.  *See Weng v. Solis*, 960 F. Supp. 2d 239, 248 (D.D.C. 2013); *see also Slinkosky v. Buffalo Sewer Auth.*, No. 97-CV-0677, 2000 WL 914118, *8 (W.D.N.Y. June 29, 2000) (ruling against the plaintiff for failing "to show that the reprimand [letters]

affected the compensation, promotion opportunities, or any other term, privilege, or condition of her employment"). "Courts focus on ultimate employment decisions such as hiring, granting leave, promoting and compensating employees in this context and adverse employment actions do not include purely subjective injuries, such as dissatisfaction with reassignment, public humiliation, or loss of reputation." *Brown v. Georgetown Univ. Hosp. Medstar Health*, 828 F. Supp. 2d 1, 8 (D.D.C. 2011) (quotation omitted). "[P]ublic criticism, overbearing scrutiny, and other less than civil behavior . . . do not rise to the level of a materially adverse action as required by Title VII." *Borrero v. Am. Exp. Bank Ltd.*, 533 F. Supp. 2d 429, 437-38 (S.D.N.Y. 2008).

Plaintiff first argues that she suffered an actual pecuniary loss through the loss of overtime and the expenditure of two weeks of sick leave and two weeks of vacation time. It is certainly true that an involuntary loss of overtime or vacation benefits can establish an adverse employment action. *See Robinson v. Goulet*, 525 Fed. Appx. 28, 31 (2d Cir. 2013). However, that is not what Plaintiff is claiming. Defendant Blaine did not use his authority to force Plaintiff to take leave or ban her from working overtime. Plaintiff made a choice. An employee who turns down overtime or uses benefits has not been subjected adverse action. *See West v. Maxon Corp.*, No. IP 98-0339, 2001 WL 1712511, *3 (S.D. Ind. Dec. 10, 2001) (citing *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997)). Plaintiff chose to use her leave benefits to seek respite from a stressful work environment and opted to work less instead of dealing with a spiteful supervisor. Therefore, Plaintiff's pecuniary harms do not establish an adverse action.

Plaintiff then argues that Defendant Blaine's other conduct, including the harassment, investigations, and negative evaluations individually and collectively constitute an adverse employment action. Plaintiff is incorrect. None of the claims resulted in a tangible change in her

working conditions. Plaintiff was exonerated of all accusations and her annual evaluation was upgraded from "Good" to "Excellent" after she appealed. As such, none of her claims can, individually, establish an adverse employment action.

Further, courts do not "consider the cumulative effect of individually alleged adverse employment actions when evaluating an intentional discrimination claim . . . ." *Figueroa v. N.Y. Health & Hosps. Corp.*, 500 F. Supp. 2d 224, 230 (S.D.N.Y. 2007) (citation omitted). A "series of minor indignities . . . which ha[ve] no discernible impact on the material terms and conditions of . . . employment" do not constitute an adverse employment action. *Jaeger v. N. Babylon Union Free Sch. Dist.*, 191 F. Supp. 3d 215, 227 (E.D.N.Y. 2016). Thus, aggregating the effects of Defendant Blaine's conduct does not establish an adverse employment action.

Therefore, for this and the above discussed reasons, the Court finds that Plaintiff cannot establish the adverse employment action element of a NYSHRL discrimination claim. As such, Defendants' motion for summary judgment is granted as to Plaintiff's NYSHRL discrimination claim.

**C.    First Amendment Retaliation Under 42 U.S.C. § 1983 Against Defendant Blaine**

In order to state a *prima facie* case of First Amendment retaliation under § 1983, a plaintiff must allege that "(1) his speech was constitutionally protected, (2) he suffered an adverse employment decision, and (3) a causal connection exists between his speech and the adverse employment determination against him." *Brunell v. Clinton County, N.Y.*, 334 Fed. Appx. 367, 370 (2d Cir. 2009) (citation omitted). A government employee's speech is constitutionally protected if the employee is speaking in his capacity as a citizen on a matter of public concern. *See Weintraub v. Bd. of Educ. of the City School Dist. of the City of N.Y.*, 593 F.3d 196, 200-01 (2d Cir. 2010) (citations and quotations omitted). An employee is not speaking in his capacity as

a citizen for purposes of the First Amendment if he is acting pursuant to his official duties. *See Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).

### 1. Protected Speech

In determining whether a plaintiff's speech was constitutionally protected, the court must determine "whether [he] spoke as a citizen on a matter of public concern." *Garcetti*, 547 U.S. at 418 (citation omitted). This requires two separate determinations: "(1) that the employee speak as a citizen, and (2) that the employee speak on a matter of public concern." *Kelly v. Huntington Union Free Sch. Dist.*, 675 F. Supp. 2d 283, 291 (E.D.N.Y. 2009) (citing *Sousa v. Roque*, 578 F.3d 164, 170 (2d Cir. 2009)). "If either of these requirements is not met, then the plaintiff's First Amendment retaliation claim must fail as a matter of law." *Id.*

Defendant Blaine argues that Plaintiff's speech did not rise to a level of public concern and thus is not protected speech as it was about redressing her own grievance. While the Court acknowledges that some of Plaintiff's speech was unprotected, the July EEOC claim regarding gender discrimination was constitutionally protected.

Plaintiff's initial conflict with Defendant Blaine began after she reported an altercation with CO Laware. Plaintiff made the initial complaint because she believed CO Laware's conduct was inappropriate. However, a public employee who voices "concerns about the conduct of coworkers" is not engaging in a matter of public concern. *Huth v. Haslun*, 598 F.3d 70, 74 (2d Cir. 2010). Thus, Defendant Blaine's retaliation to Plaintiff's original complaint does not constitute First Amendment retaliation.

However, Plaintiff's EEOC and ODM complaints alleged gender discrimination. Even though the complaints were made with the intention to redress her personal grievances with Defendant Blaine, "a speaker's motive is not dispositive in determining whether his or her speech

addresses a matter of public concern." *Sousa*, 578 F.3d at 173 (citing *Reuland v. Hynes*, 460 F.3d 409, 415 (2d Cir. 2006)).  The Second Circuit has held that reporting gender discrimination is constitutionally protected speech.  *See Konits v. Valley Stream Cent. High School Dist.*, 394 F.3d 121, 125 (2d Cir. 2005) ("Gender discrimination in employment is without doubt a matter of public concern.  Indeed, we have held repeatedly that when a public employee's speech regards the existence of discrimination in the workplace, such speech is a matter of public concern") (citing *Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144, 150 (2d Cir. 2000)).  Given the importance of preventing gender discrimination in the workplace, Plaintiff's claims were matters of public concern and thus constitutionally protected speech.

### 2. Causation

"The causal connection between the protected activity and the adverse employment action can be established indirectly with circumstantial evidence . . . or directly through evidence of retaliatory animus." *Sumner*, 899 F.2d at 209.  "Evidence of disparate treatment of employees who engaged in similar conduct," *id.*, and "showing that the protected activity was closely followed in time by the adverse [employment] action," *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 845 (2d Cir. 2013), are examples of circumstantial evidence that a plaintiff can use to establish a causal connection.  With regards to temporal proximity, the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman-Bakos v. Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001).  *Compare Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 446-47 (2d Cir. 1999) (holding that abusive acts within one month of receipt of deposition notices may be retaliation for initiation of lawsuit more than one year earlier);

*Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998) (finding that discharge less than two months after the plaintiff filed a sexual harassment complaint with management and ten days after filing complaint with state human rights office provided *prima facie* evidence of a causal connection between protected activity and retaliation); *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980) (holding that eight-month gap between EEOC complaint and retaliatory action suggested a causal relationship); *with Hollander v. American Cyanamid Co.*, 895 F.2d 80, 85-86 (2d Cir. 1990) (holding that the passage of three months too long to suggest a causal relationship between complaint and failure to provide good recommendation); *Vecchione v. Dep't of Educ.*, No. 10-CV-6750, 2014 WL 2116146, *5 (S.D.N.Y. May 16, 2014) (finding that a gap in time of more than six months not sufficient to establish causal link).

Here, the alleged retaliatory conduct increased in intensity within days of Plaintiff filing her initial EEOC complaint. Plaintiff contends, among other things, that Defendant Blaine almost immediately increased the frequency of inspecting her workstation while he did his rounds. The frequency and intensity of Defendant Blaine's retaliation after the July Complaint are *prima facie* evidence of a causal connection. Thus, there is a sufficient causal connection to support Plaintiff's claim.

### 3. Retaliatory Adverse Action

The standard for evaluating an adverse employment action is the same in First Amendment and Title VII retaliation claims. *See Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006). "[R]etaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Id.* at 225 (quotation marks omitted); *see also Nixon v. Blumenthal*, 409 Fed. Appx. 391, 392 (2d Cir. 2010).

Defendant Blaine argues that Plaintiff cannot demonstrate that he took an adverse employment action against her. However, as previously discussed, the aggregate effect of Defendant Blaine's conduct is sufficient to sustain a retaliation claim under Title VII. Given that Title VII and First Amendment retaliation claims use the same standard for determining an adverse action, the Court rejects Defendant Blaine's argument.

Based on the forgoing, Defendant Blaine's motion for summary judgment as to Plaintiff's First Amendment retaliation claim is denied.

**D.    Qualified Immunity**

"The doctrine of qualified immunity shields public officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).

> For a constitutional right to be "clearly established" for purposes of determining whether an officer is entitled to qualified immunity, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that *in the light of pre-existing law the unlawfulness must be apparent*."

*Mollica v. Volker*, 229 F.3d 366, 370-71 (2d Cir. 2000) (quoting *Anderson v. Creiehton*, 483 U.S. 635, 640 (1987)) (emphasis in original). "Where the right at issue in the circumstances confronting police officers . . . was clearly established but was violated, the officers will nonetheless be entitled to qualified immunity 'if . . . it was objectively reasonable for them to believe their acts did not violate those rights.'" *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007) (quotation and other citation omitted).

"Although a mere mistake in the performance of an official duty may not deprive the officer of qualified immunity, the doctrine does not shield performance that either (a) was in violation of clearly established law, or (b) was plainly incompetent." *Manganiello v. City of New York*, 612, F.3d 149, 165 (2d Cir. 2010) (citations omitted). "With respect to both the legal question and the matter of competence, the officials' actions must be evaluated for objective reasonableness. . . . That is, '[e]ven if the right at issue was clearly established in certain respects . . . an officer is still entitled to qualified immunity if "officers of reasonable competence could disagree" on the legality of the action at issue in its particular factual context.'" *Id.* (quotations omitted).

The determination of whether an official's conduct was objectively reasonable is a mixed question of law and fact. *See Zellner*, 494 F.3d at 367 (citing *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004)) (other citations omitted). "The ultimate question of whether it was objectively reasonable for the officer to believe that his conduct did not violate a clearly established right, *i.e.*, whether officers of reasonable competence could disagree as to the lawfulness of such conduct, is to be decided by the court. However, '[a] contention that . . . it was objectively reasonable for the official to believe that his acts did not violate those rights has "its principle focus on the particular facts of the case."'" *Id.* (quotation and other citations omitted).

If there is no dispute as to any material fact, the issue of whether the official's conduct was objectively reasonable is an issue of law to be decided by the court. *See id.* at 368 (citation omitted). Any unresolved factual issues, however, must be resolved by the jury. *See id.* (quoting *Kerman*, 374 F.3d at 109) (other citations omitted). Once the court has received the jury's decision as to "what the facts were that the officer faced or perceived," the court must then "make the ultimate legal determination of whether qualified immunity attaches on those facts."

*Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003) (quotation omitted); *see also Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995) (quotation omitted).

In an entirely conclusory manner, Defendant Blaine contends that he is entitled to qualified immunity.  As discussed above, there remain significant unresolved factual issues that must be resolved by a jury.  Until that time, a determination on qualified immunity would be inappropriate.  Therefore, Defendant Blaine's motion for summary judgment on qualified immunity is denied.

## E.    Punitive Damages

Defendant Blaine argues that even if Plaintiff's claims survive summary judgment, his conduct was devoid of "malice or evil intent."  *Id.*  "[P]unitive damages may be awarded when the plaintiff has shown that defendant's conduct was motivated by evil motive or intent, or when it involves callous indifference to federally protected rights of others." *Picciano v. McLoughlin*, 723 F. Supp. 2d 491, 506 (N.D.N.Y. 2010) (quotation omitted).  Generally, it is a matter for the jury to determine whether the plaintiff's proof of misconduct is sufficient.  *See id.*  Where the plaintiff's claim withstands a defendant's motion for summary judgment, "the Court [generally] cannot state as a matter of law that the [plaintiff] is not entitled to punitive damages."  *Id.* (quoting *Lazaratos v. Ruiz*, No. 00–CV–2221, 2003 WL 22283832, *9 (S.D.N.Y. Sept. 30, 2003)).  As Defendant Blaine's motion for summary judgment on Plaintiff's First Amendment and NYSHRL retaliation claims has been denied, the Court declines to dismiss Plaintiff's request for punitive damages.

## F.    Failure to Train and Supervise and Hostile Work Environment

State Defendants moved for summary judgment as to Plaintiff's failure to train and supervise claim against Defendants Holdridge and LaValley and Defendant Blaine moved for

summary judgment as to a NYSHRL hostile work environment claim.  "A court 'may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.'" *Martinez v. City of New York*, No. 11-CV-7461, 2012 WL 6062551, *1 (S.D.N.Y. Dec. 6, 2012) (quoting *Lipton v. County of Orange*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004)).  When a defendant files a summary judgment motion, "a partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims."  *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014).  Since Plaintiff's opposition did not mention her failure to train and supervise or hostile work environment claims, the Court deems these claims abandoned.  Since the failure to train and supervise claim is the only claim brought against Defendants Holdridge and LaValley,

## V. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that State Defendants' motion for summary judgment (Dkt. No. 91) is **GRANTED** as to Plaintiff's failure to train and supervise claim and Plaintiff's NYSHRL sex discrimination claim and **DENIED** as to Plaintiff's Title VII and NYSHRL retaliation claims; and the Court further

**ORDERS** that Defendants Blaine's motion for summary judgment (Dkt. No. 92) is **GRANTED** as to Plaintiff's NYSHRL sex discrimination claim and **DENIED** as to Plaintiff's First Amendment and NYSHRL retaliation claims; and the Court further

**ORDERS** that Defendants Daniel Holdridge and Thomas LaValley be terminated as parties; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: March 20, 2018
      Albany, New York

Mae A. D'Agostino
U.S. District Judge